FILED

2010 Aug-26  PM 12:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BETTY JO VINES,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:09-CV-1447-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social,** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

Betty Jo Vines, claimant, filed an application for Disability Insurance Benefits on September 30, 2005.  She alleges disability beginning January 1, 2001 because of affective/mood disorders and osteoarthritis. (R. 30).  The Commissioner denied her initial claim for disability on March 20, 2006. (R. 32). She filed a timely request for hearing on April 25, 2006. (R. 39).  An Administrative Law Judge (ALJ) held the hearing on October 31, 2007 in Birmingham, Alabama. (R. 238).  Claimant, represented by an attorney, testified at the hearing, as did her brother and a Vocational Expert (VE). (R.238-278).  The ALJ issued an unfavorable decision denying benefits on February 13, 2008.  The ALJ found that the claimant suffered from osteoarthritis and bipolar disorder, but failed to meet a listed impairment and had a residual functional capacity that allowed her to perform light work. (R. 23-29).  Ms. Vines requested that the Appeals Council review the ALJ's decision.  On May 21, 2009, the Appeals Council denied her request for

1

review.  This denial constituted the final decision of the Commissioner of the Social Security

Administration and exhaustion of claimant's administrative remedies.

## II. ISSUES PRESENTED

On appeal, the claimant raises two issues: whether the ALJ failed properly to consider the

opinion evidence of the commissioner's own consultative examining source, and whether the

ALJ failed to properly apply the evidence to Listing 12.04.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham*

*v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No... presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. The Commissioner's factual determinations, however, are not reviewed *de novo*, but

are affirmed if supported by substantial evidence. "Substantial evidence" is "more than a mere

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Richardson v. Perales*, 401 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look

only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of evidence that detracts from the evidence relied on by the

ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

To qualify for benefits under Listing 12.04 in the Listing of Impairments a claimant must

demonstrate either the depressive or manic syndrome, under "Paragraph A," and at least two of

the four following "Paragraph B" criteria: marked restriction of activities of daily living; marked

difficulties in maintaining social functioning; marked difficulties in maintaining concentration,

persistence, or pace; or repeated episodes of decompensation, each lasting for an extended

duration.  20 CFR 404, Subpart P, Appendix 1.

Alternatively, the claimant must meet the "Paragraph C" criteria:

Medically documented history of a chronic affective disorder of at least 2 years'
duration that has caused more than a minimal limitation of ability to do basic
work activities, with symptoms or signs currently attenuated by medication or
psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that
even a minimal increase in mental demands or change in the environment would
be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly
supportive living arrangement, with an indication of continued need for such an
arrangement. *Id.*

In evaluating mental impairments, the ALJ must use the "special technique" that requires

separate evaluations on a four-point scale of how the claimant's mental impairments impact 1)

daily living activities; 2) social functioning; 3) concentration, persistence, or pace; and 4)

episodes of decompensation. *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005).

For a reviewing court to determine whether the decision of an ALJ is supported by

substantial evidence, he must "state specifically the weight accorded to each item of evidence

and why he reached that decision." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1991).

Where an administrative agency reaches its conclusion by "focusing upon one aspect of the

evidence and ignoring other parts of the record ...we cannot properly find that the administrative

decision is supported by substantial evidence." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th

Cir. 1986).  An ALJ may not simply "discover a piece of evidence which supports that decision,

but . . . disregard other contrary evidence." *Id.*

The ALJ is "duty-bound to...weigh the evidence, giving individualized consideration to

each claim that comes before him." *Miles v. Chater*, 84 F.3d 1397, 1401 (11th Cir. 1996). This

4

means that he "must consider the applicant's entire medical condition," *Jamison v. Bowen*, 814

F.2d 585, 588-89 (11th Cir. 1985), including the testimony presented at the hearing. *Lucas v.*

*Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990).   The failure to apply the correct legal standards

or to provide the reviewing court with a sufficient basis from which to determine that the correct

principles have been followed mandates reversal. *Gibson v. Heckler*, 779 F.2d 619, 622 (11th

Cir. 1986).

## V. FACTS

Claimant was born on August 28, 1963 and was thirty-seven years old at the time of

alleged onset of disability. (R. 240, 243).  She has a high school education and completed about a

year of college work.  She has worked as a bartender, waitress, desk clerk and cashier, all of

which are light, semi-skilled jobs. (R. 243, 266).  In her initial claim, claimant alleged disability

resulting from affective/mood disorders, osteoarthritis and associated disorders. (R. 30).

Additionally, she stated during her hearing that she has "a lot of problems with memory...really

terrible short and long term memory." (R. 244).  In her brief to this court, claimant alleges

disability commencing on January 1, 2001 and resulting from bipolar disorder, generalized

anxiety disorder, personality disorder not otherwise specified (NOS), degenerative joint disease

and chronic and severe pain.

### *Medical History*

In February of 2000, claimant was admitted to the emergency room of Baptist Health

Center for wrist injuries. (R.133).  The doctor treated her injuries with a wrist splint and

prescribed her Lortab. (R. 134).  The records show no further complications from this injury.

On September 6, 2000, claimant visited Dr. Oepen, a psychiatrist, after visiting the

5

emergency room for an alleged suicidal overdose. (R. 186).  The doctor recorded complaints of "memory problems, a foggy mind, stress headaches, surprisingly little sleep problems with 3-4 interruptions per night, and chronic auditory hallucinations with rare visual hallucinations since childhood which are not related to bipolar disorder." (R.185).  At that time she reported that she took Effexor, Celexa, and BuSpar for her bipolar disorder as prescribed by her primary care physician. (R. 186).  Dr. Oepen directed her to discontinue BuSpar and to begin taking Depakote for mood stabilization and reduction of chronic headaches. Dr. Oepen also prescribed Risperdal for her memory and concentration problems. *Id*.

On September 4, 2001, claimant presented to the Baptist Health Center after coming to the emergency room in an intoxicated state with depression and suicidal ideation. (R. 137).  The treating psychiatrist, Dr. Lecroy, noted a history of psychiatric problems, beginning in 1982 when she was diagnosed with bipolar disorder, decreased energy, decreased appetite, recent weight loss, and recent drug and alcohol abuse. *Id*.  The record shows that she was taking Bufferin, Wellbutrin SR, Seroquel, Librium and Celebrex at home. (R. 138).

Two days later, she visited Dr. Langlow, a psychiatrist, who conducted an evaluation.  He recorded claimant's recent depression, history of bipolar disorder, and feeling irritable and angry for no reason.  The record also states that before admission to the hospital she drank a 12 pack of beer, three mixed vodka drinks, took three Xanax, and began considering suicide. (R. 141).  The claimant noted that she was not taking the Depakote prescribed for her, and reported having attempted suicide three times in the past. (R. 142).  According to this evaluation, the medications she was taking included Bufferin, Wellbutrin, Seroquel, Librium and Celebrex.  Claimant also reported a family history of depression, including suicide. *Id*.  Her global assessment of function

6

(GAF) was recorded as 40. (R. 144). She was released on September 6, 2001 and claimed to feel "much better." (R. 139).

Claimant admitted herself to the Baptist Health Center on September 26, 2001, reporting that she was hallucinating and wanted to stop all of her medications. (R. 152). She claimed to be seeing people out of the corner of her eye, water on the floor, and bats in the emergency room. (R. 153). Dr. Oepen, who treated her, reported that she had failed to stop taking her Celebrex, as she was instructed to do because of its interaction with Lithium, because she forgot. (R. 152-53). Also, though she denied having taken any benzodiazepines, her blood work indicated otherwise. (R. 153). Dr. Oepen diagnosed the claimant with bipolar disorder in remission and nitrous-oxide induced temporary hallucination. He then referred her to Dr. Brecht, a psychiatrist, whose psychological evaluation indicated in "reducing order of magnitude" the following: depression, dysthymic disorder (a form of chronic depression), depressive personality, anti-social personality, borderline personality, and anxiety disorder. (R. 155).

The record also shows that on December 16, 2001, claimant presented to Baptist Health Montclair Medical System after overdosing on an entire bottle of Seroquel, a prescription medicine, and three glasses of wine. (R. 166). At that time, her current medications included Seroquel, Lithobid, nortriptyline, Wellbutrin SR and Synthroid. Dr. Weidow, a psychiatrist, reported that though her "mood was depressed" and "affect blunted," she reported no hallucinations or suicidal thoughts. (R. 167). Dr. Weidow diagnosed her with schizoaffective disorder, cluster B personality disorder, migraine headaches, severe chronic mental illness and a GAF of 60, up from 45 at admission. (R. 166).

After this episode, claimant had follow-up appointments at East Side Mental Health

Center with a therapist, Mary Barr.  Claimant was also under the care of Dr. Stone, from December 26, 2001 to January 14, 2003.  At the first appointment, claimant reported "crying all the time." (R. 181-82).  On January 4, 2002, she told the doctor that she was not "doing too good" and that she had quit her "boring job." (R. 181).  On July 12, 2002, the record states that she was taking Lithobid, Seroquel, and Wellbutrin and "doing so much better overall with these meds."  But the record also indicated that claimant had racing thoughts, diminished vocabulary and memory, auditory and visual hallucinations, and nightmares. (R. 180).  On September 30, 2002, the record indicates little change from before, but notes that she had "decided to get a job to get away from" herself. (R. 179).  The doctor's notes from her January 14, 2003 visit indicate that she did not want to change her medication because she was "doing so well," but also record mood swings two to three times a week, fits of rage two times a week, and a depression level of five on a scale from one to ten. (R. 178).  Medical records from Eastside Mental Health over the periods October 2004 to June 2005 and February 2007 to August 2007 indicate no significant new developments, but note continued treatment for bipolar disorder and complaints about memory problems. (R. 187-191; R. 222-233).

Between September 9, 2002 and October 26, 2005, claimant visited Dr. Darnell, a family practitioner eleven times. (R.192-204).  The medical records from these visits show complaints of a number of physical maladies, including thrush, incontinence, diarrhea, urinary tract infection, pain in her bones (feet, ribs, elbows), problems sleeping, sores in her nose and mouth, productive cough and congestion, yeast infection and a thumb injury.  In addition, on September 10, 2002, she visited Dr. Darnell complaining of a "panic like" attack and wanted to discuss her psychiatric medications. (R. 202)

8

Claimant's Disability Determination Service "Daily Activities Questionnaire" of November 11, 2005 also lists repeated complaints about memory problems affecting her ability to function. For instance, she claims that "my mind goes blank [and] I have to call someone to help me," that "I forget what I am doing - burn food or leave laundry in the washer or dryer," that "it takes me a long time to remember something new," and that she gets "upset trying to learn new things [and] my mind won't understand what I'm trying to do." (R. 86).

Dr. Porter, a clinical psychologist, completed an examination of claimant on February 16, 2006 at the referral of the Disability Determination Services. (R. 205). Dr. Porter's notes under the "Observations/Mental Status" portion of her exam state:

> She was a good reporter of recent and remote memory. She was friendly, polite, and cooperative throughout the examination. Her overall demeanor was fairly jovial. Affect was somewhat anxious, but otherwise full and appropriate to content. She was alert and oriented in all spheres. Her performance was below expectation on serial 7's, making change, similarities, and digits backwards. She performed within expectation on judgments, immediate verbal memory (5/5 words), and digits forward. She recalled 3/5 words on a 5 minute delayed verbal memory. Her general fund of information was grossly intact. She is estimated to be in the average range of customary intellectual functioning. (R. 205).

In the "Psychiatric History" section of the report, Dr. Porter made the following relevant observations:

> When asked about her current mood, she remarked, "I just feel wonderful." She reported feeling "more happy," has "more energy" and has started visiting friends again....When asked about anxiety, Ms. Vines remarked, "It's not as bad as it used to be." She remarked, "I don't think it's really panic," per se....She remarked, "I used to" hear people walking and her name being called by her husband, but denied having either experience in 6-7 months. She occasionally sees "small shadows, like rodents," in her periphery....Ms. Vines remarked she has, "lots of problems learning new things...just general brain cramps." She added, "I have no short-term memory or long-term memory to speak of." Per her report, she has always been an avid reader but now is unable to remember the previous day's material, and thus, finds it rather frustrating and pointless to read books. She

reportedly forgets day to day conversation and fails to follow through with plans/appointments as she forgets she made them.  She reported being virtually amnestic for numerous events from her children's childhood.  Per her memory, she remarked, "It's been bad for years." Per her report, the reported learning/memory problems are the primary reason she is unable to work. (R. 206)

Dr. Porter's "Diagnostic Impressions" included "Bipolar I Disorder, Most Recent Episode Depressed, In Partial Remission," "Generalized Anxiety Disorder," "Cognitive Disorder NOS," "Alcohol Abuse, In Sustained Full Remission," and "Personality Disorder NOS." (R. 207).

Under the "Prognosis and Recommendations," Dr. Porter included a number of important comments, including that "this examiner suspects that Ms. Vines likely experiences some degree of psychosis on occasion" and that "any psychotic symptoms likely result from periods of particularly severe mood disturbance and secondary to transient, stress-related paranoia often observed in a borderline personality."  Regarding claimant's memory problems, Dr. Porter writes: "She appears to function daily in the midst of chronic anxiety, which likely causes marked encoding problems.  The latter, in combination with medication side-effects and personality functioning, may account for her perceived memory problems."  Dr. Porter concluded that "her record of outpatient and inpatient mental health treatment do suggest marked interference in multiple domains of functioning, such that her ability to maintain gainful employment is often compromised." (R. 207).

On February 21, 2006, claimant visited Dr. Kean, a rehabilitative physician. (R. 208).   In addition to recording much of the above psychiatric history, Dr. Kean performed a physical examination.  This examination found no new maladies, and diagnosed her as having bipolar disorder, cognitive deficits, tobacco and alcohol abuse, bowel and bladder incontinence, and degenerative joint disease. (R. 212).  The doctor did, however, note that "she is a fairly good

historian, although her recall is impaired and her spouse has to provide answers." (R. 210).

Dr. Rankart, a non-examining psychiatrist, completed a psychiatric review technique based on an examination of claimant's records on March 14, 2006.  He made diagnoses of bipolar disorder, generalized anxiety disorder, and personality disorders NOS. (R. 109; R. 111; R 112A).  The functional limitation portion of the evaluation also indicated that claimant had mild restrictions on her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation, each for an extended period. (R. 115). A mental residual functional capacity assessment completed by Dr. Rankart on the same day rated the claimant "not significantly limited" or "moderately limited" in all categories, including "Understanding and Memory" and "Sustained Concentration and Persistence," and "markedly limited" in none. (R. 119-120).

*ALJ Hearing*

After the Commissioner denied the claimant's initial application and upon request for reconsideration, claimant filed a request for a hearing on April 26, 2006. (R. 23).  The hearing was held before an ALJ on October 31, 2007. *Id*.  Claimant first answered basic questions about her personal, educational and employment history. (R. 242-244).  She then related her history of bipolar I disorder, that she experienced "really high highs and really low lows," and had "a lot of problems with my memory...really terrible short and long term memory." *Id*.  Claimant reported that she saw a therapist and a psychiatrist, and that her current medications included Cymbalta, lithium, Elavil and Zyprexa. (R. 244-245).  She indicated that she took lithium, a mood stabilizer; Elavil, an antidepressant; Zyprexa for manic depression; and Cymbalta, an

antidepressant with pain medication. (R. 246).

Claimant reported that, as part of her bipolar disorder, she sometimes has thoughts of suicide, and has attempted suicide by overdose on a number of occasions, the last in 2001. (R. 246-247).  Claimant also confirmed that she phases "in and out from depressive episodes," and that she usually has more depressive episodes. (R. 247-248).  She asserted that she has "good days," neither manic nor depressive, two or three days a week.  On those days, she is able to walk her dogs, paint pictures, call friends and family, write letters and do projects around the house. *Id*.  In addition, on a "day to day basis," claimant makes dinner, does laundry, cleans the house, runs errands and watches TV. (R. 249).  When she has a depressive phase, however, she reports that she "normally just lay[s] around on the couch or in the bed and sometimes I watch TV, sometimes I just lay there doing nothing."  During these phases, her husband must help her get dressed and with her grooming. *Id*. Claimant says she needs that sort of help once or twice a week on most weeks. (R. 250).

Claimant also reports manic episodes in which she has trouble opening the mail because of stress, mops the floors and cleans compulsively, and sometimes only half-completes tasks. (R. 250-251).  During these periods, she has difficulty concentrating or thinking, and sometimes thinks "the wrong thing," and tends "to get in trouble." (R. 251).  She also loses a lot of energy, does not want to do things, and sometimes has trouble sleeping – going without sleep for as much as two or three days.  Claimant also reports problems in social situations, that she does not "like to be around strangers." *Id*.

Primarily, however, claimant asserts that her memory problems would prevent her from going back to work. (R. 252).  She asserts that she "can't remember how to make drinks" or learn

a new menu as to her past work in restaurants.  Moreover, she has a hard time dealing with

customers because she lacks patience and gets "really upset and angry and irritated with people."

Responding to her attorney's questions, she affirms that she goes "from thought to thought

rapidly without completing a thought" and has "random thoughts that just run on and on." *Id*.

Concerning her difficulty working as a cashier, the claimant complains that she cannot

count, which causes her trouble confirming that she has entered the amount correctly, and cannot

remember prices.  (R. 253).  Claimant had a job at City Meats since her alleged date of onset, but

maintained that she was only able to keep that job because the owners were friends. (R. 254-

255).  Responding to the ALJ's question about that job, she claimed that she was given "special

consideration" as the owners' friend in that they did not fire her for her performance, for instance

when the cash register was off by $3,000. (R. 256).  Also, she noted that she did not work a

regular schedule, but only came in when they needed help. (R. 257).

Claimant testified that the medication she was taking helped partially moderate her

bipolar disorder, but caused side effects like dry mouth and difficulty verbalizing. (R. 259-260).

She stated that the manic and depressive episodes still caused her trouble working, but that her

memory was the primary problem. (R. 261-262).

Next, claimant's husband testified that she becomes disoriented and that he sometimes

has to help her put toothpaste on her toothbrush or button her blouse because of shaking, possibly

caused by her medication. (R. 263).  He also observed that that she sometimes forgets and leaves

the stove on and that he has to help her make lists of basic tasks. (R. 263-264).

The ALJ next interviewed, Dr. Kessler, a vocational expert, based on the above testimony

and her review of the file. (R. 265-266).  The VE testified that claimant's past work experience

consisted of light, semi-skilled work in which she might be required to lift up to 20 pounds occasionally, 10 pounds frequently, and to stand for much of the day. (R. 266).

The VE also testified that if claimant's memory problems are "mild to moderate, then she would be able to perform simple tasks and remember them" but might have to use written aids. (R. 268).  Moderately severe to severe memory problems, however, would prevent her from keeping up with even simple tasks and would prevent working altogether. *Id.*   The VE asserted that someone with mild to moderate memory problems would be able to do light work jobs such as a cashier, counter clerk in retail, or sedentary jobs such as cashier, document preparer, receptionist, general clerk, or tester and sorters of objects. (R. 269-274). However, a person with moderately severe to severe memory problems would be unable to do even these jobs. (R. 275).

Finally, the ALJ questioned the VE about whether anything she had heard in the testimony would prevent claimant from doing the types of work that she had done previously. The VE responded that depression that would require the claimant to lie down would prevent her from working if she had to miss more than one day of work per month, and that this level of absenteeism would not be tolerated regardless of memory problems.  (R. 275-276).

*ALJ Decision*

On February 13, 2008, the ALJ issued a decision finding the claimant had not "been under a disability within the meaning of the Social Security Act from January 1, 2001." (R. 23). The ALJ first found that the claimant met the insured status requirements of the Social Security Act, had not engaged in substantial gainful activity since January 1, 2001, and had the severe impairments of bipolar disorder and osteoarthritis. (R. 25).

The ALJ stated that the record showed a history of bipolar disorder, and alcohol and

Xanax abuse.  He also observed that one record stated that she hated her "boring" job and was not afraid of losing it.  Next, the ALJ discussed that claimant had worked two jobs between October 2004 and June 2005.  In addition, the ALJ wrote that notes from Dr. Weidow, the claimant's psychiatrist, indicated that medication helped with her mood swings, and that claimant told Dr. Porter, the consultative examiner, that she felt "wonderful" on her new medication.  The ALJ's decision also refers to claimant's complaints about her difficulty remembering and learning, but noted: "however, she also related that she had earned A's and B's in high school and B's and C's in her one year of college."  Also, the ALJ recalled that Dr. Porter observed that claimant's "grooming, speech and thought processes were unremarkable," though she did have a "somewhat diminished" short term memory and "difficulty with mathematical concepts and serial sevens." (R. 25-26).

The ALJ also cited Dr. Kean's examination concerning her tobacco and alcohol use, daily activities, weight, height, and apparent lack of problems walking, or with nerves, reflexes or sensation. (R. 26)  He did, however, note that the claimant did have "slight diminution of strength in all four extremities, with negative straight leg raising."  He stated that Dr. Kean had diagnosed degenerative joint disease and bipolar disorder. *Id*.

Next the ALJ considered the Listing 12.04, Affective Disorders, regarding the claimant's bipolar disorder and found that she did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments." *Id*.  To support this conclusion, the ALJ stated that claimant failed to meet any of the following criteria, at least two of which are necessary to meet the listing: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence,

or pace; or repeated episodes of decompensation, each of extended duration. 20 CFR 404,

Subpart P, Appendix 1.  This last criterion the ALJ defined as "three episodes within one year, or

an average of once every four months, each lasting for at least two weeks." (R. 26).  The ALJ

found that the claimant had only mild restriction in the first two of these, medium restriction in

the third, and had no documented episodes of decompensation. *Id*.

The ALJ also ruled that the claimant did not meet the "paragraph C" criteria, the alternate

means of establishing Listing 12.04 disability, because

> [t]here was no medically documented history of repeated episodes of
> decompensation, each of extended duration; or of such marginal adjustment that
> even a minimal increase in mental demands could be expected to cause
> decompensation; or of a current history of one or more years' inability to function
> outside a highly supportive living arrangement, with an indication of continued
> need for such an arrangement. (R. 27).

Next, the ALJ determined that the claimant had a residual functional capacity to

> lift and/or carry up to 25 pounds on a frequent basis and up to 50 pounds on an
> occasional basis; to stand and/or walk for a total of up to six hours per eight-hour
> workday; and to sit (with normal breaks) for the total of up to six hours per eight-
> hour workday [but] is restricted to simple, routine and repetitive tasks. *Id*.

In making this determination, the ALJ stated that he "considered all symptoms

and the extent to which these symptoms can reasonably be accepted as consistent with the

objective medical evidence and other evidence." *Id*.  The ALJ's decision was based

primarily on a finding that the claimant's "admitted daily activities are inconsistent with

the degree of mental limitations that she described." (R. 28).  Though she testified that

she had "difficulties with her memory, problems sleeping, recurrent suicidal ideation,

irritability and social avoidance," she nevertheless "described daily activities that include

painting, caring for her dogs, running errands, keeping up with friends via telephone and

written correspondence, and cleaning the house." *Id*.

## VI. DISCUSSION

Plaintiff contends that the ALJ failed properly to consider the evidence of the consultative examiner. For the reasons stated below, the court agrees with the claimant and finds that the ALJ's decision is not supported by substantial evidence.

Where an administrative agency reaches its conclusion by "focusing upon one aspect of the evidence and ignoring other parts of the record ...we cannot properly find that the administrative decision is supported by substantial evidence." *McCruter*, 791 F.2d at 1548. An ALJ may not simply "discover a piece of evidence which supports that decision, but...disregard other contrary evidence." *Id*. Social Security proceedings are inquisitorial, not adversarial. *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).

For a reviewing court to be able to determine whether substantial evidence supports the decision of an ALJ, in his opinion he must "state specifically the weight accorded to each item of evidence and why he reached that decision." *Cowart*, 662 F.2d at 735; see also *Owens v. Heckler*, 748 F.2d 1511, 1514-15 (11th Cir. 1984) ("A clear articulation of both fact and law is essential to this Court's ability to conduct a review that is both limited and meaningful."); *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986), (an ALJ must "state the weight accorded each item of impairment evidence and the reasons for his decisions on such evidence.").

The ALJ is "duty-bound to...weigh the evidence, giving individualized consideration to each claim that comes before him." *Miles*, 84 F.3d at 1401. This means that he "must consider the applicant's entire medical condition," *Jamison*, 814 F.2d at 588-89, including the testimony presented at the hearing. *Lucas*, 918 F.2d at 1574. For the ALJ simply to state that he "has

carefully considered all the testimony at the hearing, the arguments made, and the documents described in the List of Exhibits," where he does not state the weight accorded to relevant evidence, is not sufficient. *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1985).  The failure to apply the correct legal standards or to provide the reviewing court with a sufficient basis from which to determine whether the correct principles have been followed mandates reversal. *Gibson*, 779 F.2d at 622.

The record supports a finding that she suffers from affective/mood disorders, primarily bipolar disorder, and osteoarthritis.  Such psychological afflictions do not always resolve into separate ailments with discrete symptoms, but overlap, and the court must consider all of the alleged symptoms in combination.  The record supplies evidence that claimant has suffered from symptoms such as mania, depression, difficulty verbalizing and remembering, auditory and visual hallucinations and anxiety as well as suicidal episodes.

The ALJ ignored or failed to state the weight accorded to substantial pieces of evidence, among these parts of the opinion of the Department of Disability Services' consultative physician, Dr. Porter. See *Cowart*, 662 F.2d at 735 (for a reviewing court to be able to determine whether substantial evidence from the consultative physician's opinion supports the decision of an ALJ, in his opinion he must "state specifically the weight accorded to each item of evidence and why he reached that decision."). Rather, he  proffers only the evidence that supports his decision.  Consequently, this court cannot find that his opinion is supported by substantial evidence. *See McCruter*, 791 F.2d at 1548 (where an administrative agency reaches its conclusion by "focusing upon one aspect of the evidence and ignoring other parts of the record ...we cannot properly find that the administrative decision is supported by substantial evidence.").

18

While claimant bears the burden of proving disability, "Social Security proceedings are inquisitorial rather than adversarial [,...] where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits. " *Sims*, 530 U.S. at 120. The combination of the ALJ's failure either to mention or to state the weight accorded various pieces of evidence indicates that he has not investigated facts that favor granting benefits.

The ALJ neglected to mention most of claimant's extensive treatment history for bipolar disorder. His decision contains nothing resembling a compilation of relevant medical facts, but rather consists of a selective presentation of only evidence that supports his position. For instance, while he cites the instances in which claimant reported doing well, or even "wonderful" (which, this court notes, are consistent with manic episodes), or that her medication sometimes helped to stabilize her moods, he does not mention contrary physician reports of her depressive episodes. For instance, during one examination in which claimant reported feeling "wonderful," she also complained of occasionally seeing "small shadows, like rodents" in her periphery and having "no short-term memory or long-term memory to speak of." The ALJ also alludes to claimant's numerous presentations to the emergency room as being "briefly hospitalized" for bipolar depression, but does not mention that these instances involved attempted suicide, auditory and visual hallucinations, or recurrent suicidal ideation. Neither does he mention claimant's numerous prescription medications or the effects that they might have on her claims of cognitive and memory problems–concerns echoed by treating and consultative physicians. Having failed to mention selective portions of the record, the ALJ accordingly failed to state the weight he gave to that evidence as required. *See Ryan*, 762 F.2d at 942.

The ALJ's treatment of Dr. Porter's records constitutes the most egregious example of his

selective discussion of evidence.  He notes those pieces of her report that support a finding that

claimant is not disabled, but fails to address her comments that strongly support a finding of

disability.  Dr. Porter noted that claimant "appears to function daily in the midst of chronic

anxiety, which likely causes severe encoding problems," which "in combination with medication

side-effects and personality functioning, may account for her perceived memory problems." (R.

207).  She concluded that claimant's "record of outpatient and inpatient mental health treatment

do suggest marked interference in multiple domains of functioning, such that her ability to

maintain gainful employment is often compromised." *Id*.  The ALJ's decision records neither of

these statements that strongly support claimant's disability application.  Rather, he mentions only

those portions of her record, that  indicate the claimant had no such disabling symptoms:

> On examination, the claimant's grooming, speech and thought processes were
> unremarkable.  Her gait appeared normal and she was cooperative.  Short-term
> memory was somewhat diminished and the claimant had difficulty with
> mathematical concepts and serial sevens.  Estimated cognitive functioning was
> average. (R. 26)

The sharp contrast between the relative benignity of the symptoms the ALJ mentioned from Dr.

Porter's report and her discussion of "marked interference in multiple domains of functioning,

such that her ability to maintain gainful employment is often compromised" strongly supports the

conclusion that he simply "discover[ed] a piece of evidence which supports that decision,

but...disregard[ed] other contrary evidence." *McCruter*, 791 F.2d at 1548.

While an ALJ has discretion to determine what weight to give to a piece of evidence, case

law requires that he must describe that weight in his opinion.  *Gibson*, 779 F.2d at 623.  Here,

where the ALJ does not mention a number of symptoms that the medical record contains and

does not state the weight accorded to much relevant evidence, his repeated assertions that he has

carefully considered the entire record and all the evidence is not sufficient. *See Ryan*, 762 F.2d at 942, (for the ALJ simply to state that he "has carefully considered all the testimony at the hearing, the arguments made, and the documents described in the List of Exhibits," where he does not state the weight accorded to relevant evidence, is not sufficient).  Failure to do so means that this court cannot conclude that he has considered the record as a whole and weighed all pertinent evidence. *Miles*, 84 F.3d at 1401 (the ALJ is "duty-bound to...weigh the evidence.").

The failure to apply the correct legal standards or to provide the reviewing court with a sufficient basis from which to determine that the correct principles have been followed mandates reversal. *Gibson*, 779 F.2d at 622.  Because the ALJ has failed to discuss or to state the weight accorded to numerous pieces of crucial evidence, including important portions of the consultative physician's opinion, the court finds, in accordance with the case law of this circuit, that the decision of the ALJ is not supported by substantial evidence.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is not supported by substantial evidence and is to be REVERSED and REMANDED to the Commissioner for consideration of the entire record–not just those portions of the record that support a decision denying benefits.  The court will enter a separate order consistent with this opinion.

DONE and ORDERED this 26th day of August 2010.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE